IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTENNIAL SCHOOL DISTRICT, | : | CIVIL ACTION |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| S.D., by and through his Parents and natural | : | |
| guardians Daniel and Lori D., | : | NO. 10-CV-4129 |
|     Defendants | : | |

**MEMORANDUM OPINION**

Defendant/Counter-Plaintiff S.D. has raised various challenges to Plaintiff/Counter-Defendant Centennial School District's ("Centennial" or "District") alleged failure to provide him with a public education because of his disability. S.D. seeks summary judgment on Count 1 of S.D.'s Counterclaim, which challenges a Hearing Officer's decision limiting S.D.'s claims to a two-year period ending in 2009. Centennial agrees summary judgment is the appropriate method for deciding the claim.

For the following reasons, S.D.'s motion is GRANTED. Because the District failed to fulfill its affirmative obligations under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 et seq., and corresponding Pennsylvania law, S.D. and his parents did not have actual or constructive knowledge S.D. might have been deprived of services for which he was eligible under the IDEA until after January 23, 2007.

**I.      PROCEDURAL HISTORY**

On January 23, 2009, S.D.'s parents filed a due process complaint alleging Centennial denied S.D. a Free Appropriate Public Education ("FAPE") under the IDEA and § 504 of the Rehabilitation Act, 29 U.S.C. § 794, because it failed to identify S.D. as a child with a disability

and provide appropriate accommodations. See Notice of Complaint for Due Process at 10-11, In re S.D., ODR No. 9645/08-09 KE (Pa. Special Educ. Hr'g Officer Jan. 23, 2009). Due process hearings were conducted over eight sessions between April 23, 2009 and March 5, 2010.

The first two hearings were to determine the applicable statute of limitations. See Hr'g Officer Correspondence No. 4 at 1, In re S.D., ODR No. 9645/08-09 KE (Pa. Special Educ. Hr'g Officer Aug. 14, 2009) [hereinafter Hr'g Officer Statute of Limitations Determination]. On August 14, 2009, the Hearing Officer concluded the statute of limitations began to run on September 5, 2001. Id. The Hearing Officer summarily concluded S.D.'s parents knew or should have known of the alleged action forming the basis of their complaint when they re-enrolled S.D. in the District in fifth grade after the staff at Our Lady of Good Counsel School told them S.D. was missing too much school and falling behind. Id. By fifth grade, the Hearing Officer found, S.D.'s parents acknowledged the public school could offer more help. Id. The Hearing Officer determined neither exception to the statute of limitations applied.[1] Id. The Hearing Officer noted "each day of the alleged FAPE denial is a separate action from which the Parents knew or should have known of their right to file a complaint . . . ." Id.[2] The Hearing Officer concluded "every date up to January 23, 2007, two years back from the date Parents filed the instant complaint on January 23, 2009, is untimely . . . ." Id. S.D.'s claims, therefore, were limited to the two-year period between January 23, 2007 and January 23, 2009. Id. at 2.

---

[1] The statute of limitations is tolled if a parent was prevented from requesting a due process hearing due to "(i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent." 20 U.S.C. § 1415(f)(3)(D).

[2] Neither party disputes this point.

Six more hearings were held to determine whether S.D. was denied a FAPE between January 23, 2007 and January 23, 2009. See Notes of Testimony of Hr'g, Vols. III-VIII, In re S.D., ODR No. 9645/08-09 KE (Pa. Special Educ. Hr'g Officer Aug. 25, 2009, Sept. 1, 2009, Sept. 15, 2009, Dec. 2, 2009, Dec. 7, 2009, Mar. 5, 2010).[3] On May 19, 2010, the Hearing Officer found for S.D., reasoning the District failed to identify S.D. as a child with a disability and to provide reasonable accommodations. See Decision at 3, In re S.D., ODR No. 9645/08-09 KE, ODR No. 09469/08-09 LS (Pa. Special Educ. Hr'g Officer May 19, 2010).

On August 16, 2010, Centennial filed this suit, seeking reversal of the May 19, 2010 order, and alleging the Hearing Officer was motivated by bias and had incorrectly denied Centennial's motion for recusal. See Complaint, Centennial Sch. Dist. v. S.D., No. 10-CV-4129 (E.D. Pa. Aug. 16, 2010).

## II.   FACTUAL HISTORY

Twenty-one-year-old S.D. suffers from asthma and a lifelong gastrointestinal condition that causes nausea and cyclic vomiting. Hr'g, Vol. I at 42-43. S.D.'s mother testified he has required accommodations since kindergarten. Id. at 149-50. S.D.'s parents, however, did not make a written request to the District for an IDEA evaluation until January 23, 2009. Id. at 170.

S.D. began kindergarten in the District in 1996.[4] Id. at 43. S.D. was often unable to take

---

[3] The Notes of Testimony are contained in six volumes, which I will cite as Hr'g, Vol. __.

[4] Most of the testimony refers to the school year by S.D.'s grade, rather than year. The parties agree on the following dates for each school year: kindergarten was the 1996-97 school year; first grade was the 1997-98 school year; second grade was the 1998-99 school year; third grade was the 1999-2000 school year; fourth grade was the 2000-01 school year; fifth grade was the 2001-02 school year; sixth grade was the 2002-03 school year; seventh grade was the 2003-04 school year; eighth grade was the 2004-05 school year; ninth grade was the 2005-06 school year; and tenth grade was the 2006-07 school year. Hr'g, Vol. I at 79-80.

the bus because he was vomiting. Id. at 48. Even after S.D.'s mother drove him to school and walked him to the classroom, S.D. sometimes was unable to attend school because he was ill. Id. at 48-49. The teacher warned S.D.'s mother that S.D. was missing too much school. Id. at 54.

Neither the teacher nor the District offered services, discussed potential accommodations, or provided S.D.'s mother with any written notice of her rights. See id. at 55-56. S.D.'s parents withdrew S.D. from the District after kindergarten and enrolled him in first grade at Our Lady of Good Counsel School, id. at 70, because they "felt . . . they would be a little more understanding at the smaller school in a smaller atmosphere," id. at 58. S.D.'s mother hoped Our Lady of Good Counsel would provide accommodations the District had not offered. Id. at 153-54. S.D. remained at Our Lady of Good Counsel through fourth grade, id. at 70, but continued to miss school due to his medical condition, id. at 72. His teachers permitted S.D. to make up work, but warned his parents he was missing too much school. Id.

S.D.'s parents re-enrolled him in the District in 2001 at the beginning of fifth grade, believing that "there [were] other provisions with the public school that could help him, and . . . prepare[] [him] to go into middle school." Id. S.D.'s problems with vomiting and school attendance persisted. Id. at 73-74. S.D.'s teachers and the school nurse were aware of the problem, but the District offered no services or assistance. Id. at 76. S.D.'s mother did not "demand" help, but when she would explain S.D.'s medical condition to his teachers "they would . . . look concerned, but not necessarily say this is what we can do for you." Id. at 77. The District did not explain S.D.'s mother's rights under the IDEA, see id. at 76, 78, such as her right to request an evaluation -- the first step to assessing the need for further services under the IDEA, see 20 U.S.C. § 1414(a)(1)(A).

4

S.D. began middle school in the District in 2002. Hr'g, Vol. I at 80. S.D.'s mother explained his medical condition to the school nurse and his homeroom teacher. Id. at 80-81. S.D. continued to miss school. Id. at 82. His teachers were "frustrated that he wasn't there," and that he had to make up work. Id. Although a guidance counselor was available to help S.D. "with the whole transition of the medical difficulties and trying to be there, and . . . do what he has got to do," id. at 84, the District never offered services or informed S.D.'s mother of her rights under the IDEA, see id. at 84-85.

During the 2002-03 school year, S.D. and his mother met with the middle school principal before S.D. left school early one day due to illness.[5] Id. at 85-86. S.D.'s mother explained S.D.'s ongoing problems. Id. at 86. She said: "[T]he principal didn't seem to be really responsive. He just was pretty adamant about responsibility and getting to school and . . . now you're in middle school . . . . [T]he principal really didn't give us much hope to help us." Id. at 86-87.

S.D. was hospitalized shortly thereafter, and his parents withdrew him from the District because he didn't "feel that [it was] a safe place for him when [he was] feeling sick." Id. at 88. The District did not offer services to S.D. when withdrawal was discussed, nor did anyone explain S.D.'s IDEA rights. Id. at 88-89. S.D.'s mother said his needs were not being met at the public middle school. Id. at 157. S.D. was then enrolled in St. Andrew Catholic School. Id. at 91.

When S.D. began the ninth grade, he was enrolled in Archbishop Wood High School, id. at 92, because S.D.'s parents feared the District would not accommodate his needs, id. at 158.

---

[5] S.D.'s mother did not specify when in the school year this conversation occurred.

S.D.'s condition continued to limit his school attendance, and his parents met with a psychologist, the principal, his teachers, and the school counselor. Id. at 92. The school counselor suggested S.D. enroll in homebound schooling.[6] Id. at 93. Because Archbishop Wood did not offer homebound schooling, the counselor suggested S.D.'s parents dually enroll him in homebound schooling with the District. Id. S.D.'s homebound instruction began in the middle of the ninth grade, but he received credit for only one class. Id. at 108-11.

S.D. withdrew from Archbishop Wood in the tenth grade, and his parents re-enrolled him in the District's high school. Id. at 112-13. The District failed to suggest conducting an educational evaluation during the tenth grade. Id. at 116-17, 130. S.D. experienced difficulty in the beginning of tenth grade, id. at 116, prompting a meeting to discuss S.D.'s absences, id. at 118-19. S.D.'s mother was not advised of her rights under the IDEA, id. at 119, nor given any information about an evaluation, id. at 135. The District did, however, permit S.D. to arrive at school two hours late, and withdrew S.D. from morning classes. Id. at 128.

S.D.'s mother, however, had hoped for more meaningful assistance from the District. She testified: "I depended on them. I had faith in the school . . . to help me get through it. If there was something to offer I guess they would have brought it up, but they didn't." Id. at 130-31. S.D. returned to homebound instruction during the 2006-07 school year and failed some of his classes. Id. at 167. S.D.'s mother testified she "realized [at the end of the school year] he should have got something more. They should have kept a better watch on him because he ended up on homebound and then[] . . . failed some of his classes again." Id.

---

[6] Homebound schooling involves instruction provided by the school in the student's home and is offered to students who are unable to attend school. 22 Pa. Code § 11.25.

A notice of rights under the IDEA, including the right to request an evaluation, was published in the local newspaper annually,[7] id. at 199-215, and was printed on calendars distributed to parents each school year, Hr'g, Vol. II at 318-23.  The notice explained the right to a FAPE and the process used to identify children with disabilities, including the right to request an evaluation.  See, e.g., The Intelligencer, Sept. 30, 2003, Ex. 41 for Centennial School District, In re S.D., ODR No. 9645/08-09 KE (Pa. Special Educ. Hr'g Officer).

## III.    LEGAL STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing the record reveals no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings to set forth specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(e)(2).  However, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts"; it must produce competent evidence supporting opposition.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  I must resolve all justifiable inferences in the non-moving party's favor.  Sommer v. Vanguard Group, 461 F.3d 397, 403 (3d Cir. 2006).  I may not weigh the evidence or make

---

[7] The notices were published in The Intelligencer, which is circulated in Eastern Montgomery, Central Bucks, and Upper Bucks counties in Pennsylvania.  Contact the Intelligencer, https://www.formrouter.net/circulation@BUCKS/intelligencer/contact_us.html (last visited Dec. 5, 2011).

credibility determinations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Therefore, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

To defeat a motion for summary judgment, factual disputes must be both material and genuine. Anderson, 477 U.S. at 248. An issue is "material" if it is predicated upon facts that are relevant and necessary and that may affect the outcome of the matter pursuant to the underlying law. Id. An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 248-49.

Summary judgment is the proper method of resolving statute of limitations issues in an IDEA case. See J.L. ex rel. J.L. v. Ambridge Sch. Dist., 622 F. Supp. 2d 257, 266 (W.D. Pa. 2008). In reviewing a dispute brought under the IDEA's administrative process, I must conduct a "modified de novo" review, S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 269-70 (3d Cir. 2003), giving "due weight" and deference to the findings in the administrative proceedings, Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982). "Factual findings from the administrative proceedings are to be considered prima facie correct," and if I do not adhere to those findings, I am "obliged to explain why." S.H., 336 F.3d at 270. The factual findings of the Hearing Officer can be set aside only if there is "contrary nontestimonial extrinsic evidence on the record." Id. at 270 & n.3.[8] The Hearing Officer, however, failed to make any findings of fact

---

[8] Centennial urges me not to consider the August 25, 2009 to March 5, 2010 hearings because Hearing Officer DeLauro made her statute of limitations determination without relying on them. Section 1415 permits me to consider additional evidence at the request of any party. 20 U.S.C. § 1415(i)(2)(C). My review of the August 25, 2009 to March 5, 2010 hearings, in which the evidence was limited to events occurring between January 23, 2007 and January 23, 2009,

on the record, see Hr'g Officer Statute of Limitations Determination,[9] so I must make my own factual findings upon review of the record.

Conclusions of law are subject to plenary review. P.P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 735 (3d Cir. 2009). I "'must decide independently whether the requirements of the IDEA are met.'" Susan N., 70 F.3d at 757 (quoting Murray v. Montrose Cnty. Sch. Dist., 51 F.3d 921, 927 (10th Cir. 1995)). The Hearing Officer's determination of the requirements of the statute of limitations is subject to plenary review, but whether S.D. proved an exception to the statute of limitations is a question of fact subject to clear error review. P.P., 585 F.3d at 735.

## IV.   DISCUSSION

The IDEA's statute of limitations states:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.[10]

20 U.S.C. § 1415(f)(3)(C).

The action referred to in the statute of limitations is the school district's failure "to respond sufficiently and effectively to concerns expressed by parents about a child's functioning

---

establishes the testimony in those hearings is not relevant to the statute of limitations issue. Accordingly, I do not consider evidence from those hearings.

[9] The only facts cited by the Hearing Officer in her two-page statute of limitations determination are (1) S.D.'s parents re-enrolled S.D. in the District's fifth grade after staff at Our Lady of Good Counsel informed them S.D. was missing too much school and falling behind; and (2) S.D.'s mother acknowledged she believed the public school could offer her son more help. Hr'g Officer Statute of Limitations Determination at 1.

[10] Pennsylvania does not have an explicit time limitation for requesting a hearing. P.P., 585 F.3d at 730.

in school." In re K.M., ODR No. 01889-10-11KE, at 32 (Pa. Special Educ. Hr'g Officer June 15, 2011), available at http://204.186.159.23/odr/HearingOfficerDecisions/01889-10-11.pdf. "[A]ccrual of the statute of limitations does not depend on [a plaintiff's] knowledge of the law, but rather on a plaintiff's knowledge of the injury." Keitt v. New York City, No. 09-8508, 2011 WL 4526369, at *10 (S.D.N.Y. Aug. 26, 2011). It is triggered "when the parent 'knew or should have known about the alleged action that forms the basis of the complaint' and not when the parent becomes aware that the school district's actions are actionable." J.P. v. Enid Pub. Schs., No. 08-937, 2009 WL 3104014, at *6 (W.D. Okla. Sept. 23, 2009) (emphasis omitted) (quoting 20 U.S.C. § 1415(f)(3)(C)).

S.D. asserts the statute of limitations began to run in 2008, because until that point S.D.'s parents had no knowledge the District had denied their son potential services. Br. Supp. Def./Countercl.-Pl. S.D. et al.'s Mot. Partial Summ. J./J. on the Administrative R. as to Count I of S.D. et al's Countercl. at 21, Centennial Sch. Dist. v. S.D., No. 10-4129 (E.D. Pa. Aug. 25, 2011) [hereinafter Defendant's Brief]. S.D. also maintains his parents did not have constructive knowledge of the denial of available services because the "District's inaction" prevented them from understanding the available options to address S.D.'s educational needs in light of his medical condition. Id. at 22. I agree, based on the following evidence, which was not cited or discussed by the Hearing Officer.

Under the IDEA, an initial evaluation is required before special education and related services are provided. 20 U.S.C. § 1414(a)(1)(A). A parent, a child, a state agency, or a local educational agency can initiate a request for an evaluation to determine whether a child has a disability. Id. § 1414(a)(1)(B). Pennsylvania regulations require such a request by a parent be

made in writing.  22 Pa. Code § 14.123(c).  If a parent makes an oral request for an evaluation, the school must provide the parent with a "permission to evaluate form" within ten days.  Id.  After a parent consents, an evaluation is conducted to determine whether the child has a disability and to identify the child's educational needs.  20 U.S.C. § 1414(a)(1)(c).  If the child is determined to have a disability, an individualized education program is developed, identifying measurable annual goals for the child and stating the services to be provided to help the child reach those goals.  Id. § 1414(d).

S.D. concedes his parents made no written request to the District for an evaluation until after January 23, 2007.  See Hr'g, Vol. I at 170.  S.D.'s mother, however, verbally raised her concerns about the impact of S.D.'s medical condition on his education multiple times and requested help every year S.D. attended public school.  See id. at 54 (S.D.'s mother spoke to S.D.'s teacher during kindergarten); id. at 73, 77 (fifth grade); id. at 80-81, 83-89 (sixth grade); id. at 163-65 (ninth grade); id. at 119 (tenth grade).  Each time, the District did nothing.[11]

Requiring a talismanic incantation by the parents requesting an evaluation of their child, using the language of the IDEA, is inconsistent with the goals of the IDEA.  See 20 U.S.C. § 1400(d)(1)(B) (purpose of IDEA is "to ensure that the rights of children with disabilities and parents of such children are protected"); 22 Pa. Code § 14.102(a)(1)(v) (purpose of regulations is to ensure "rights of children with disabilities and parents of these children are protected").  S.D.'s mother's requests for help can be fairly construed as requests for an evaluation which went unheeded.  Each time S.D.'s mother sought help from the District, it failed to provide her with a "permission to evaluate form," as required by Pennsylvania law.  Hr'g, Vol. I at 55 (S.D.'s

---

[11] All fact findings are based on a preponderance of the evidence.

mother received no offer of services or written notice of her rights after requesting help from kindergarten teacher); id. at 76, 78 (fifth grade); id. at 89-90 (sixth grade); id. at 119 (tenth grade). Despite multiple reports of S.D.'s medical problems and discussions with administration and faculty about the best way to proceed with his education from kindergarten through tenth grade, the District never provided guidance or suggested S.D. undergo an evaluation. Instead, S.D.'s teachers became frustrated with his absences and his need to make up schoolwork. Id. at 82. At one point, the principal lectured S.D. and his mother about S.D.'s attendance obligations. Id. at 86-87. All of this left S.D.'s mother with the belief she was not entitled to accommodations beyond those offered by the school. As she explained: "I depended on them. I had faith in the school . . . to help me get through it. If there was something to offer I guess they would have brought it up, but they didn't." Id. at 130-31.

Nevertheless, the District contends S.D.'s parents were never affirmatively told their son was not entitled to services. Br. Opp'n Def./Countercl.-Pl. S.D. et al.'s Mot. Partial Summ. J./J. on the Administrative R. as to Count I of S.D. et al.'s Countercl. at 14, Centennial Sch. Dist. v. S.D., No. 10-4129 (E.D. Pa. Sept. 13, 2011) [hereinafter Plaintiff's Brief]. This view, of course, fails to recognize the District's obligation under the IDEA and Pennsylvania law, as well as the legislative intent of ensuring students are appropriately evaluated and provided with necessary services. See 20 U.S.C. § 1400(d)(1)(A) (purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs"); 22 Pa. Code § 14.102(a)(1)(i) (purpose of the IDEA is to ensure "[c]hildren with disabilities have available to them a free appropriate public education which is designed to enable the student to participate

fully and independently in the community"). Although the District never denied S.D. services or information, it failed to affirmatively respond to S.D.'s mother's requests for help.

As the District notes, a notice of rights under the IDEA, including the right to request an evaluation, was published in a local newspaper annually, id. at 199-215, and was printed on calendars distributed to parents each year, Hr'g, Vol. II at 318-23. See Plaintiff's Brief at 11. Thus, S.D.'s mother arguably could have discovered her right to request an evaluation. The District also contends S.D.'s parents demonstrated a lack of due diligence because they failed to consult an attorney to determine whether S.D. was entitled to services. Plaintiff's Brief at 32. I find, however, a reasonable inference from the evidence is that the District's failure to provide S.D.'s parents with a "permission to evaluate form" -- as required by state law -- could have led them to believe that: (1) S.D. had no rights under the IDEA; or (2) a request for an evaluation or a meeting with an attorney would be fruitless. This is supported by the ongoing, yet unsuccessful attempts by S.D.'s parents to confer with District officials to address their son's condition and seek a solution to their son's educational issues. The District had an affirmative obligation, regardless of their publications and disseminations, to provide S.D.'s mother with a "permission to evaluate form." 22 Pa. Code § 14.123(c). The Hearing Officer made no factual findings on this issue, despite substantial evidence supporting S.D.'s claim. See Hr'g Officer Statute of Limitations Determination.

S.D.'s parents could not have known of the action forming the basis of the complaint because the District failed to fulfill its obligations under the IDEA and corresponding Pennsylvania law. By failing to provide S.D.'s parents with a "permission to evaluate form" from kindergarten to tenth grade, the District precluded S.D.'s parents from identifying services


possibly available to S.D.[12]  Thus, S.D.'s parents could not have known S.D. might have been deprived of services for which he was eligible under the IDEA, triggering their right to bring a due process complaint to challenge the alleged deprivation.[13]

Accordingly, the statute of limitations did not begin to run until at least the end of the 2006-07 school year, making the due process complaint timely.[14]  S.D.'s motion for summary judgment is granted.  An appropriate order follows.

---

[12]  The District maintains S.D. is not entitled to services under the IDEA.  Plaintiff's Brief at 32-33.  That issue is irrelevant to the limitations inquiry.  Once S.D.'s mother orally requested help, the District was required to follow the procedures set out by the IDEA and corresponding Pennsylvania law to determine whether S.D. was disabled under the statute.  I make no determination whether S.D. was entitled to services.

[13] The Hearing Officer determined S.D.'s parents knew or should have known of the alleged action which formed the basis of their complaint on September 5, 2001.  Hr'g Officer Statute of Limitations Determination at 1.  The Hearing Officer offered no explanation for her determination.  Id.  The District asserts S.D.'s parents knew of the alleged action because they knew of his problems attending school and the accommodations offered by the District, and were unsatisfied with the accommodations, as evidenced by their decisions, in first grade and fifth grade, to change schools to seek more accommodations.  Plaintiff's Brief at 28-31.  Although the evidence suggests S.D.'s mother did not believe the District was meeting her son's educational needs, S.D.'s parents could not have known their son was deprived of services to which he was entitled because the District failed to comply with its obligation to initiate an IDEA evaluation.

[14] Because the January 23, 2009 complaint was timely for a limitations period accruing no later than January 23, 2007, I need not determine exactly when the statute of limitations began to accrue.